Stephen W. MILLER and Janette Elaine Miller
v. STATE of Arkansas

CR 00-336                                                27 S.W.3d 427

Supreme Court of Arkansas
Opinion delivered October 5, 2000

*Bassett Law Firm*, by: *Woody Bassett*; and *Charles L. Stutte*, for appellants.

*Mark Pryor*, Att'y Gen., by: *David R. Raupp*, Sr. Ass't Att'y Gen., for appellee.

DONALD L. CORBIN, Justice. Appellants Stephen and Janette Miller were charged in the Washington County Circuit Court with manufacturing marijuana and possession of drug paraphernalia. Following the trial court's denial of the Millers' motion to suppress evidence seized pursuant to a search warrant, they both entered conditional pleas of guilty pursuant to Ark. R. Crim. P. 24.3. The Millers then appealed the trial court's decision regarding the motion to suppress to the Arkansas Court of Appeals. The court of appeals affirmed the trial court's ruling in a 5-4 decision. *See Miller v. State*, 69 Ark. App. 264, 13 S.W.3d 588 (2000). We granted the Millers' petition for review of that decision pursuant to Ark. Sup. Ct. R. 1-2(e)(i). When we grant review following a decision by the court of appeals, we review the case as though it had been originally filed with this court. *Fowler v. State*, 339 Ark. 207, 5 S.W.3d 10 (1999), *cert. denied*, 120 S. Ct. 1558 (2000); *Travis v. State*, 331 Ark. 7, 959 S.W.2d 32 (1998). We find no error and affirm.

The record reflects that during the morning hours of October 22, 1998, the Millers were stopped for speeding on U.S. Highway 75 near Denison, Texas, by Officer Sharalin Fichtl. Upon stopping the Millers, Fichtl activated the video camera mounted on her patrol car's dash that recorded the events of the stop and search. Fichtl asked Mr. Miller to step out of his vehicle so that she could talk to him. According to Fichtl, Mr. Miller appeared to be nervous and answered her questions in a rambling manner. Fichtl ran a warrants check on Mr. Miller and discovered that he had prior convictions for the sale of marijuana, possession of LSD, and possession of a weapon. She then inquired as to whether Mr. Miller was in possession of any weapons, drugs, or other contraband. Mr. Miller stated that he was not. Ficthl then asked if she could take a look in his car, and Mr. Miller agreed. He thereafter stated that he

would like to be on his way, and Fichtl responded that if she did not find any contraband, he would be on his way shortly.

Fichtl went around to the driver's side of the vehicle and immediately popped the latch to open the trunk. The search was interrupted, however, when Fichtl observed Mr. Miller reach into the trunk. Fichtl ordered him to back away from the vehicle, and she closed the trunk. Fichtl then called for backup before completing the search. She explained to the Millers that she had called for backup and would complete the search once another officer arrived on the scene. Once the backup officer arrived, Fichtl resumed the search. Within about thirty seconds, she located a tin can under the front passenger seat of the car. An inspection of the can revealed that it contained marijuana. Fichtl then placed the Millers under arrest and advised them of their *Miranda* rights. After placing the Millers in her patrol car, Ficthl continued to search the vehicle. In the trunk, she found a wrapped package. She asked the Millers what was in the package, and they replied that it was a gift for Mrs. Miller's sister. Fichtl then asked Mrs. Miller if she could open the box, and Mrs. Miller consented. Inside the box was approximately three pounds of marijuana. The Millers were then transported to the Grayson County Sheriff's Office.

On October 23, 1998, Fichtl contacted Detective Mike Henderson of the Fourth Judicial District Drug Task Force in Fayetteville. Fitchl explained to Henderson that she had arrested the Millers the previous day. She told him about the marijuana and explained that it was found in a box with an address label containing Mr. Miller's name and address. She also told Henderson that there was an Amazing Grace newspaper from Fayetteville, dated October 21, 1998, in the box with the marijuana. Finally, Fichtl told Henderson that while in the police cruiser, Mrs. Miller stated that a friend had brought the package to their residence in Fayetteville and had given it to her to deliver.

After receiving this information, Henderson contacted Sergeant Kenny Yates and Detective Mike Reynolds who went to the Millers' home. According to Yates, he and Reynolds went to the Millers' residence to determine if the friend mentioned by Mrs. Miller or anyone else was at the home. The officers knocked several times on the front door. After receiving no response, the officers went around to the back door of the residence and knocked

again. According to Yates, when he stepped onto the back porch, he smelled the strong odor of marijuana coming from the home. He also noticed small pots, potting soil, and plant food on the back porch. While Yates and Reynolds left to obtain a search warrant, Detectives McCarville and Huddler were assigned to watch the residence.

While conducting surveillance from a parking lot next door to the Millers' residence, McCarville observed a garden in the Millers' backyard with six marijuana plants growing in the garden. McCarville contacted Yates with this information, who in turn notified Henderson, who was preparing the affidavit in support of a search warrant. After reviewing the affidavit, Judge Ray Reynolds issued a search warrant for the Millers' residence. Upon executing the search warrant, police discovered marijuana in a sealed container in the kitchen, marijuana growing in the attic, as well as the six marijuana plants growing in the garden. Several weapons and drug paraphernalia were also seized from the residence. The Washington County Prosecuting Attorney charged the Millers with manufacturing marijuana and possession of drug paraphernalia. The Millers filed a motion to suppress the evidence seized from their home, and the denial of that motion is the subject of this appeal.

For reversal, the Millers argue that the trial court erred in denying their motion to suppress the evidence seized from their home because such items were the fruit of an illegal search and seizure. Specifically, they contend that the search of their vehicle was illegal, and therefore, the information given to the police in Fayetteville was tainted and could not support the search warrant. Appellants further contend that the police searched their home without probable cause in violation of the Fourth and Fourteenth Amendments of the United States Constitution, as well as Article 2, § 15, of the Arkansas Constitution.

When reviewing a trial court's ruling on a motion to suppress, we view the evidence in a light most favorable to the State, make an independent determination based on the totality of the circumstances, and reverse only if the ruling was clearly against the preponderance of the evidence. *Mazepink v. State*, 336 Ark. 171, 987 S.W.2d 648, *cert. denied*, 120 S. Ct. 321 (1999); *Fultz v. State*, 333 Ark. 586, 972 S.W.2d 222 (1998).

## Search of Vehicle in Texas

■ We address the validity of the vehicle search first. The Millers do not challenge that Officer Fichtl lacked a valid reason to stop them; rather, it is their contention that Fitchl conducted a warrantless search of their vehicle, and that none of the exceptions to the warrant requirement were present. They argue that any consent given for the search was the result of coercion by Fichtl. The United States Supreme Court has held that the test for a valid consent to search is that the consent be voluntary, and "[v]oluntariness is a question of fact to be determined from all the circumstances." *Ohio v. Robinette*, 519 U.S. 33, 40 (1996) (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 248-49 (1973)). The Court in *Robinette* stated that it would be unreasonable to require police officers to always inform detainees that they are free to go before a consent to search may be deemed voluntary.

Here, when Officer Fitchl was questioning Mr. Miller, the following exchange took place:

> [FICHTL]: Okay. Do you mind if I look in your vehicle, make sure you don't have any illegal substances or large sums of cash or weapons, or ...
>
> [MILLER]: No, no.
>
> [FICHTL]: ... contraband?
>
> [MILLER]: Yeah, you can go ahead. I just wish we could go.
>
> [FICHTL]: Okay, well if I can look, if there's nothing in there, then it will take me a couple of minutes — five minutes — and I will let you be on your way.
>
> [MILLER]: Okay.

■ Now, Appellants attempt to argue that the only reason Mr. Miller gave consent is because Fichtl implied that she would not let them leave until she could search the car. The circumstances surrounding this stop do not support this argument. Mr. Miller clearly gave his consent to the search and then stated that he would like to be on his way. Fichtl never intimated that the only way she was going to allow the Millers to leave, was if they let her search their car. Moreover, at the suppression hearing, Fichtl testified that

she knew that she did not have probable cause to search the vehicle, and that if the Millers had not given their consent to the search, she would have let them go immediately.

■ Appellants also argue that even if we find that the Millers' consent was valid, such consent was limited to the car's interior, thus the scope of Officer Fichtl's search exceeded the permissible bounds. In *Florida v. Jimeno*, 500 U.S. 248, 251 (1991), the United States Supreme Court held that the standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of "objective" reasonableness — what the typical reasonable person would have understood by the exchange between the officer and the suspect. The Court held that once the respondent gave the police officer permission to search his vehicle, it was objectively reasonable for that officer to believe that such permission extends to opening containers found in the vehicle. Finally, the Court pointed out that a reasonable person may be expected to know that narcotics are generally carried in some form of a container.

■ Here, Mr. Miller consented to a search of the vehicle for the specific purpose of searching for any illegal substances, money, weapons, or other contraband. The Millers placed no limits on Officer Fichtl and what she could search. When she discovered the tin can containing the marijuana, neither of the Millers attempted to stop her from opening the can. It was reasonable for Officer Fichtl to conclude that the permission granted by the Millers included a search of any containers found in the car's interior. Therefore, the scope of Fichtl's search did not exceed reasonable bounds.

In sum, the Millers were properly stopped for speeding. They, in turn, gave consent to a search of their vehicle. Contrary to the Millers' assertion, there is no evidence in the record to indicate that such consent was the product of police coercion. As the result of a lawful search of the Millers' vehicle, marijuana was discovered and the Millers were arrested. Accordingly, there were no abnormalities stemming from the search of their vehicle that would render the information given to Arkansas authorities tainted.

*Search of the Fayetteville Residence*

Having determined that the search of the Millers' vehicle was valid, we now turn to the validity of the search of their residence. The Millers argue (1) that the police had no right to go to their residence; (2) that it was improper for the police to go to the back of their house; and (3) that it was improper for the police to view their house from a neighbor's property. They contend that the conduct of the police violated their constitutional rights, and therefore, any evidence seized from the home was the fruit of an illegal search.

We disagree with the Millers' assertion that the police had no right to go to their home knowing that they were incarcerated in Texas. The Fayetteville authorities received information from another law enforcement officer that the Millers had been arrested for possession of a large quantity of marijuana. Moreover, that marijuana was discovered in a box labeled with Mr. Miller's name and address. Also in that box was a Fayetteville newspaper printed the day before the Millers were arrested. Finally, the Fayetteville authorities were told that Mrs. Miller mentioned that a friend had possibly been involved in the delivery of the marijuana. Under these circumstances, we cannot say that the Fayetteville authorities acted unreasonably in going to the Millers' residence to determine if there was anyone there to interview as part of their investigation of any drug-related activity.

With that said, we must determine whether the police's action of entering the Millers' back porch area violated any Fourth Amendment principles. While Arkansas has never addressed an issue such as the present one, the Eighth Circuit Court of Appeals has considered it and found that the Fourth Amendment is not implicated when police approach the common entryways of residences, including the rear of a home, for legitimate purposes. *See United States v. Anderson*, 552 F.2d 1296 (8th Cir. 1977). The issue in *Anderson* was whether the police's action of proceeding to the backyard of a home after receiving no response at the front door, violated Fourth Amendment principles. The court determined that the police had entered an area in which there was a reasonable expectation of privacy, but went on to state that the initial intrusion was justified by legitimate police objectives, namely questioning a suspect. In so holding, the court stated:

> We cannot say that the agents' action in proceeding to the rear after receiving no answer at the front door was so incompatible with the scope of their original purpose that any evidence inadvertently seen by them must be excluded as the fruit of an illegal search.

*Id.* at 1300.

■ Here, the facts and circumstances also support a finding that the police acted reasonably in going to the rear of the home. The police entered the Millers' property as part of a legitimate police investigation to determine if anyone was at the home that they could interview. The record here indicates that the Millers' property was not fenced, and there was a little path leading around the house. Following that path, the police entered the back porch to again knock on the door. This conduct by the police did not so exceed the scope of their purpose for going to the residence as to render their conduct an unlawful search.

■ Finally, even if the police's conduct of entering the rear of the Millers' residence had resulted in an illegal search, it was proper for the trial court to deny the Millers' motion to suppress the evidence seized from their home under the "inevitable discovery" doctrine. *See Thompson v. State*, 333 Ark. 92, 966 S.W.2d 901 (1998); *Brunson v. State*, 296 Ark. 220, 753 S.W.2d 859 (1988). In *Thompson*, this court held that suppressed evidence is otherwise admissible if the State proves by a preponderance of the evidence that the police would have inevitably discovered the evidence by lawful means.

■■ Here, we are satisfied that the State proved that the marijuana seized from the home would have been inevitably discovered. The evidence indicates that the marijuana growing in the backyard could be viewed by anyone from the adjoining property. Detective McCarville testified that while he was standing in a parking lot next to the Millers' residence, he observed the marijuana growing in the their backyard. We reject the Millers' argument that it was improper for the police to view their residence from their neighbor's property. The Millers lack standing to complain about any invasion of their neighbor's property. Rights protected by the Fourth Amendment are personal in nature. *Rakas v. Illinois*, 439 U.S. 128 (1978); *Kimble v. State*, 331 Ark. 155, 959 S.W.2d 43 (1998). This observation would have supported a search

warrant for the Millers' property, and would have inevitably led to the discovery of the evidence in the Millers' residence. Accordingly, the trial court did not err in denying the motion to suppress.

Affirmed.