John T. SCOTT *v.* STATE of Arkansas

CR 00-1373 67 S.W.3d 567

Supreme Court of Arkansas
Opinion delivered February 28, 2002

*McDaniel & Wells, P.A.*, by: *Bill Stanley*, for appellant.

*Mark Pryor*, Att'y Gen., by: *Lauren Elizabeth Heil*, Ass't Att'y Gen., for appellee.

ANNABELLE CLINTON IMBER, Justice. Appellant John T. Scott was charged with manufacturing a controlled substance (methamphetamine), attempt to manufacture a controlled substance (methamphetamine), and possession of drug paraphernalia with intent to manufacture methamphetamine. Mr. Scott contended below that the search of his home was unlawful and that evidence seized as a result of the search should be suppressed. The trial court denied the motion to suppress, and Mr. Scott entered a conditional plea of guilty to possession of drug paraphernalia with intent to manufacture methamphetamine pursuant to Ark. R. Crim. P. 24.3(b), reserving the right to appeal the trial court's suppression ruling. Mr. Scott was sentenced to twenty-four months in the Arkansas Department of Correction, followed by five years' suspended imposition of sentence. He now appeals the trial court's ruling on his motion to suppress. We affirm.

At the suppression hearing, Deputy Sheriff Robert Rounsavall of the Mississippi County Sheriff's Department testified that he received a tip from an anonymous caller, as well as calls from the Arkansas State Police and the Leachville Police Department, indicating that Mr. Scott was manufacturing methamphetamine in his home. All three calls were received "within a few weeks" of January 12, 2000. Deputy Rounsavall enlisted the assistance of two other law enforcement officers, Investigator Danny Foster and Sergeant Reggie Moore. The officers agreed that they did not have enough information to get a search warrant, but they hoped to get consent to search the Scott residence. As a result, all three officers

approached the Scott residence on the afternoon of January 12, 2000. According to the police report, the officers arrived at the home at 2:35 p.m. Deputy Rounsavall indicated this was an approximate time of arrival based on his recollection of looking at his watch as the officers "headed to the residence from Leachville." Before the officers got out of their truck, they decided that Investigator Foster and Sergeant Moore would go up to the front porch of the house and knock on the door. Meanwhile, Deputy Rounsavall was to go "beside the house and watch the side and the back of the house . . . [for] an officer-safety issue. . . ." All three officers were in plain clothes, wearing badges around their necks and carrying handguns.

After the officers knocked, Mr. Scott yelled, "Who is it?" Investigator Foster responded that it was the police, and, a few moments later, Mr. Scott came to the door. Sergeant Moore testified that Mr. Scott opened the door, but there was still a screen door between them and Mr. Scott. According to Mr. Scott, he opened both the wooden door and the screen door. Mr. Scott also testified that, when he opened the door, all three officers were on his front porch, and he put one of his hands on the door facing, causing all three officers to reach for their guns. However, this testimony was disputed by the officers who denied reaching for their guns when Mr. Scott opened the door. Investigator Foster told Mr. Scott they had information that he might be cooking methamphetamine in his residence and asked him if the officers could search the residence.[1] Mr. Scott denied that he was making methamphetamine and gave the officers verbal consent to search his residence and the grounds. The officers did not initially tell Mr. Scott that he had a right to refuse consent or a right to make them get a search warrant. Mr. Scott claims Investigator Foster told him that, if he did not consent to a search they would get a search

---

[1] Appellant's brief asserts that the officers told Mr. Scott they had information from a "confidential informant." The brief also asserts that both Investigator Foster and Sergeant Moore were led to believe that a confidential informant existed such that a search warrant would be easily ascertainable. The record, however, does not support these assertions. Investigator Foster clearly testified as to his knowledge: "Sergeant Rounsavall received an anonymous call or some kind of call in reference to Mr. Scott manufacturing methamphetamine." He also acknowledged that the officers were going to the Scott residence "in hopes of getting a consent to search." Sergeant Moore testified that he knew they were going to perform a "knock and talk" at Mr. Scott's residence. He also stated that Investigator Foster told Mr. Scott "the information they had received," but he could not say "exactly where [Investigator Foster] said he got it from." Deputy Rounsavall acknowledged that the reference in his report to a "confidential informant" was a "typo mistake."

warrant and confiscate all of his property. All three officers, however, denied making any such statement.

According to Investigator Foster, he went back to the vehicle to get a "Consent to Search" form after obtaining Mr. Scott's verbal consent; whereas, Sergeant Moore testified that he believed Investigator Foster had the consent form with him when they arrived at the porch. The officers' testimony was also inconsistent with respect to whether Deputy Rounsavall could hear what was being said on the porch. Nonetheless, all three officers agreed that Investigator Foster had informed Deputy Rounsavall that Mr. Scott had verbally consented to the search before the deputy walked from the driveway to the back of the house where he noticed several tanks with a turquoise-blue color around the fittings. That color, according to Deputy Rounsavall, indicated the tanks were being used for anhydrous ammonia. He then walked back around to the front of the house, where Investigator Foster was reading the written consent form to Mr. Scott. It was at this point that Mr. Scott was advised of his right to refuse consent. Though Mr. Scott testified to initially telling the officers he did not want to sign the form, the officers maintained that Mr. Scott never denied consent. In fact, he signed the written consent form at 2:50 p.m., whereupon Deputy Rounsavall advised him that he was under arrest and read him the standard Miranda warnings. Mr. Scott then told the officers they could find the methamphetamine lab in the attic, purportedly because he did not want them to tear up his house.

Based upon the evidence introduced at the suppression hearing and arguments of counsel, the trial court denied the motion to suppress. In its order, the court made the following findings:

1. That officers proceeded to the home of the defendant based upon an anonymous tip and such information did not result in the officers having a reasonable suspicion or probable cause that the defendant was involved in criminal activity.

2. That the officers in acting upon the tip had a consensual contact with the defendant and the Court hereby finds that the initial encounter occurred when the officers knocked on the defendant's door and the defendant promptly responded; the Court further finds that the officers did not engage in conduct that was threatening or that in any manner reflected a showing of force. That the officers' contact with the defendant was of a consensual nature and such contact did not constitute a seizure so as to implicate the Fourth Amendment.

3. That the State has met its burden of proof in establishing by clear and positive evidence that the defendant consented to search of his premises.

■ ■ In reviewing a ruling denying a defendant's motion to suppress, we make an independent determination, based on the totality of the circumstances, and view the evidence in the light most favorable to the State. *Travis v. State*, 331 Ark. 7, 959 S.W.2d 32 (1998). We reverse only if the trial court's ruling is clearly against the preponderance of the evidence. *Id.* We defer to the trial court in assessing the credibility of witnesses. *Laime v. State*, 347 Ark. 142, 60 S.W.3d 464 (2001).

Mr. Scott's first contention on appeal is that the officers had no reasonable suspicion to contact him and that the initial contact constituted an illegal seizure in violation of his rights under the Fourth Amendment to the United States Constitution, thereby negating the subsequent consent and search as "fruits of the poisonous tree."[2] He claims that, once he answered the door, he did not feel free to terminate his encounter with the police. The State argues that Mr. Scott's encounter with the police was voluntary, pointing out that Mr. Scott verbally consented to the search and signed a consent-to-search form. The State contends that a "knock and talk" procedure is not a seizure under the Fourth Amendment, and, therefore, a reasonable suspicion is not required.

■ A law enforcement officer may request any person to furnish information or otherwise cooperate in the investigation or prevention of crime. Ark. R. Crim. P. 2.2(a) (2001). The officer may request the person to respond to questions or to comply with any other reasonable request. *Id.* In making such a request, no officer shall indicate that a person is legally obligated to furnish information or cooperate if no legal obligation exists. Ark. R. Crim. P. 2.2(b) (2001). Compliance with such requests shall not be regarded as involuntary or coerced solely on the ground that such a request was made by a law enforcement officer. *Id.*

■ ■ This court has interpreted Rule 2.2 to provide that an officer may approach a citizen much in the same way a citizen may approach another citizen and request aid or information. *State v. McFadden*, 327 Ark. 16, 938 S.W.2d 797 (1997); *Thompson v. State*,

---

[2] Mr. Scott makes no argument under Article 2, Section 15, of the Arkansas Constitution.

303 Ark. 407, 797 S.W.2d 450 (1990). Not all personal intercourse between policemen and citizens involves "seizures" of persons under the Fourth Amendment. *Id.* A "seizure" of a person occurs when an officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen. *See Terry v. Ohio,* 392 U.S. 1 (1967).

 Police-citizen encounters have been classified into three categories. *State v. McFadden,* 327 Ark. 16, 938 S.W.2d 797.

> The first and least intrusive category is when an officer merely approaches an individual on a street and asks if he is willing to answer some questions. Because the encounter is in a public place and is consensual, it does not constitute a "seizure" within the meaning of the fourth amendment. The second police encounter is when the officer may justifiably restrain an individual for a short period of time if they have an "articulable suspicion" that the person has committed or is about to commit a crime. The initially consensual encounter is transformed into a seizure when, considering all the circumstances, a reasonable person would believe that he is not free to leave. The final category is the full-scale arrest, which must be based on probable cause.

*Id.* at 21, 938 S.W.2d at 799. (Citations omitted.) Rule 2.2(a) provides the authority for a police officer to act in the first category of nonseizure encounters. *Id.* A balancing test must be used in these situations:

> the approach of a citizen pursuant to a policeman's investigative law enforcement function must be reasonable under the existent circumstances and requires a weighing of the government's interest for the intrusion against the individual's right to privacy and personal freedom. To be considered are the manner and intensity of the interference, the gravity of the crime involved, and the circumstances attending the encounter.

*Id.* (citing *Baxter v. State,* 274 Ark. 539, 626 S.W.2d 935, *cert. denied,* 457 U.S. 1118 (1982)). Our case law has consistently held that Rule 2.2 authorizes an officer to request information or cooperation from citizens where the approach of the citizen does not rise to the level of being a seizure and where the information or cooperation sought is in aid of an investigation or the prevention of crime. *Id.*

 In *Miller v. State,* 342 Ark. 213, 27 S.W.3d 427 (2000), this court said that entry onto private property by police can be justified

by the legitimate police objective of determining if anyone is present to interview as part of an investigation of drug-related activity. There, two officers approached a home and knocked on its front door several times. *Id.* After receiving no answer, the officers followed a little path leading around the house to the back door where they knocked again. *Id.* We held that the police acted reasonably, even in going to the rear of the home, where they entered the property for a legitimate police objective and did not exceed the scope of their purpose for going to the residence. *Id.* In *Burdyshaw v. State*, 69 Ark. App. 243, 10 S.W.3d 918 (2000), the Arkansas Court of Appeals recently concluded that the police do not need reasonable suspicion to approach a residence and request consent to search. In that case, police drove up a long and narrow driveway, past "no trespassing" signs, and onto the appellant's property at 7:45 p.m. to request a consent to search the property based on an anonymous tip that the appellant was operating a methamphetamine lab at his residence. *Id.* The appellate court held that entry onto the property was not a violation of the Fourth Amendment and the consent was not a fruit of the poisonous tree. *Id.*

██ It is clear to this court that the officers in the instant case were justified in approaching Mr. Scott's residence to question him about potential criminal activity, even without reasonable suspicion or probable cause. In fact, appellant's counsel conceded as much to this court at oral argument.

██ ██ The next inquiry must be whether the initial encounter between the officers and Mr. Scott rises to the level of a Fourth Amendment seizure. The United States Supreme Court, in *Florida v. Bostick*, 501 U.S. 429 (1991), held that it was not *per se* unconstitutional for police to board a bus and ask at random, without articulable suspicion, for consent to search a passenger's luggage. A seizure does not occur simply because a police officer approaches an individual and asks a few questions. *Id.* A seizure occurs when a reasonable person would not feel "free to leave." *Michigan v. Chesternut*, 486 U.S. 567 (1988). The "free to leave" analysis, however, is not an accurate measure of the coercive effect of an encounter in situations where a person would have no desire to leave, such as where the person is seated on a bus. *Florida v. Bostick*, 501 U.S. 429. "In such a situation, the appropriate inquiry is whether a reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter." *Id.* at 436. The crucial test is whether, taking into account all circumstances, the police conduct would have communicated to a reasonable person "that he was not at liberty to ignore the police presence and go about his business." *Id.*

at 437 (citing *Michigan v. Chesternut*, 486 U.S. at 569). It is important to note that the "reasonable person" test presupposes an innocent person. *Id.* at 438.

As with a passenger on a bus, a person approached by police officers at his home would have no desire to leave. Thus, the appropriate inquiry is whether a reasonable person, in the same circumstances, would have felt free to decline the officers' request to search. In this case, the officers approached Mr. Scott's residence and attempted to gain consent to search by utilizing a procedure known as a "knock and talk." Our court of appeals has quoted the North Carolina Supreme Court's description of the procedure:

> The "knock and talk" procedure is a tactic used by law enforcement in Winston-Salem when they get information that a certain person has drugs in a residence but the officers don't have probable cause for a search warrant. The officers then proceed to the residence, knock on the door, and ask to be admitted inside. Thereafter gaining entry, the officers inform the person that they're investigating information that drugs are in the house. The officers then ask for permission to search and apparently are successful in many cases in getting the occupant's "apparent consent."

*Hadl v. State*, 74 Ark. App. 113, 116, 47 S.W.3d 897, 899–900 (2001) (quoting *State v. Smith*, 346 N.C. 794, 796, 488 S.E.2d 210, 212 (1997)). The question of whether the "knock and talk" procedure automatically violates the Fourth Amendment is an issue of first impression in this State. We thus look to other jurisdictions for guidance.

Every federal appellate court which has considered the question, including the Eighth Circuit United States Court of Appeals, has concluded that the "knock and talk" procedure is not *per se* violative of the Fourth Amendment. For example, in *Rogers v. Pendleton*, 249 F.3d 279 (4th Cir. 2001), the Fourth Circuit Court of Appeals suggested that police may approach the door of a residence to "knock and talk," seeking to speak to the inhabitants, without probable cause, a warrant, or exigency. Likewise, the Fifth Circuit Court of Appeals, in *United States v. Jones*, 239 F.3d 716 (5th Cir. 2001), concluded that the "knock and talk" investigative tactic is not inherently unreasonable. In *United States v. Johnson*, 170 F.3d 708 (7th Cir. 1999), the Seventh Circuit Court of Appeals held that a "knock and talk" is not automatically unconstitutional but warned that police must realize the inherent limitations in the more informal way of proceeding. The Seventh Circuit did find a "knock and

talk" to be in violation of the Fourth Amendment under a specific set of extreme circumstances in *United States v. Jerez*, 108 F.3d 684 (7th Cir. 1997). The *Jerez* court held that a "knock and talk" investigation became a seizure when the officers' persistence prevented the appellants from ignoring the police and maintaining their privacy and solitude. In that case, two officers approached the appellants' motel room at 11:00 p.m., took turns knocking loudly on the hotel room door for about three minutes, proceeded outside to knock on the room's exterior window for one to two minutes, and directed light from a flashlight into the room. *Id.*

The United States Court of Appeals for the Eighth Circuit has upheld a district court's determination that a defendant voluntarily consented to a search of his hotel room after officers knocked on the door of his motel room, identified themselves as law enforcement officials, were invited into the room, and obtained consent to search without the use of force. *United States v. Severe*, 29 F.3d 444 (8th Cir. 1994). Likewise, the Ninth Circuit Court of Appeals has recognized "knock and talk" as a valid procedure for nearly forty years:

> Absent express orders from the person in possession against any possible trespass, there is no rule of private or public conduct which makes it illegal *per se*, or a condemned invasion of the person's right of privacy, for anyone openly and peaceably, at high noon, to walk up the steps and knock on the front door of any man's "castle" with the honest intent of asking questions of the occupant thereof whether the questioner be a pollster, a salesman, or an officer of the law.

*United States v. Cormier*, 220 F.3d 1103, 1109 (9th Cir. 2000) (quoting *Davis v. United States*, 327 F.2d 301, 303 (9th Cir. 1964)). In *Cormier*, the Ninth Circuit held that use of the "knock and talk" procedure to gain access to a motel room was permissible, in the absence of reasonable suspicion, and did not result in a seizure of the defendant or vitiate his consent to search. *Id.*

Similarly, other state courts have come to the same conclusion. These states include: Iowa in *State v. Reinier*, 628 N.W.2d 460 (Iowa 2001); Maryland in *Scott v. State*, 366 Md. 121, 782 A.2d 862 (2001); and North Carolina in *State v. Smith*, 346 N.C. 794, 488 S.E.2d 210 (1997).

 In the instant case, we hold that the police did not need a reasonable suspicion in order to approach Mr. Scott's residence and request his assistance in a criminal investigation. As previously stated, we make an independent determination based on the totality of the circumstances, viewing the evidence in the light most favorable to the State. *Travis v. State*, 331 Ark. 7, 959 S.W.2d 32 (1998); *Wofford v. State*, 330 Ark. 8, 952 S.W.2d 646 (1997). While two officers went to the front porch, knocked on the front door, and identified themselves as police officers, another officer remained to the side of the house. After Mr. Scott responded and opened the door, one officer told him they had information that he was making methamphetamine and asked for consent to search his home. The officers did not indicate to Mr. Scott that he was legally obligated to cooperate. Taking into account all of the circumstances of the encounter and viewing the evidence in the light most favorable to the State, we cannot say that the officers' conduct here would have communicated to a reasonable person that he was not free to "ignore the police presence and go about his business." *Florida v. Bostick*, 501 U.S. at 436.[3] Thus, we conclude that the "knock and talk" investigation in this case did not amount to a "seizure" in violation of the Fourth Amendment. Accordingly, Mr. Scott's consent to search is not a fruit of the poisonous tree of an illegal seizure under *Wong Sun v. United States*, 371 U.S. 471 (1963). We affirm the trial court on this point.

 Mr. Scott's second contention on appeal is that the State failed to demonstrate by clear and positive evidence that his consent to search the premises was voluntary. A warrantless entry into a private home is presumptively unreasonable. *Norris v. State*, 338 Ark. 397, 993 S.W.2d 918 (1999). The burden is on the State to prove the warrantless activity was reasonable. *Id.* As a general matter, a warrantless entry made with consent does not violate the Fourth Amendment. *Id.* Under Ark. R. Crim. P. 11.1, an officer may conduct searches and make seizures without a search warrant or other color of authority if consent is given to the search or seizure. Ark. R. Crim. P. 11.1 (2001). The Fourth and Fourteenth Amendments require that consent not be coerced, by explicit or implicit means, by implied threat or covert force. *Schneckloth v. Bustamonte*, 412 U.S. 218 (1973). The voluntariness of consent must be judged in light of the totality of the circumstances. *Id.* It is the State's burden to prove by clear and positive evidence that consent

---

[3] The inquiry does not focus on what motivates the officers' conduct; rather, the appropriate inquiry is whether a reasonable person would feel free to decline the officers' request to search. *Florida v. Bostick*, 501 U.S. 429 (1991).

was given freely and voluntarily. *Rodriquez v. State*, 262 Ark. 659, 559 S.W.2d 925 (1978). This burden cannot be discharged by showing no more than mere acquiescence to a claim of lawful authority; it must be shown that there was no duress or coercion, actual or implied. *Id. See also Bumper v. North Carolina*, 391 U.S. 543 (1968).

Mr. Scott contends that the case of *Smith v. State*, 265 Ark. 104, 576 S.W.2d 957 (1979), wherein a search and seizure was found to violate the Fourth Amendment, has "strikingly similar facts to the present matter." Contrary to Mr. Scott's argument, that case is easily distinguishable from the situation now before this court. In *Smith*, the appellant was arrested at his home on hot check charges. *Id*. While he was dressing, officers asked for consent to search his home. *Id*. There was no doubt that the officers went to the home to search for a stolen TV and used the hot check warrant to effectuate that purpose. *Id*. During the search, they confirmed that the serial number on a TV in the home matched the one they were searching for. *Id*. Later, at the police station, Smith was asked to sign a written consent to search form. *Id*. We held that the State has a particularly heavy burden to prove that a warrantless search is voluntary *where the defendant is already under arrest and in the custody of the officers at the time it was alleged that consent was given. Id*. (Emphasis added.) Clearly, the "particularly heavy burden" analysis does not apply to the present case. Mr. Scott was not under arrest at the time he gave verbal consent to search his residence.

Next, Mr. Scott urges us to apply the case of *Evans v. State*, 33 Ark. App. 184, 804 S.W.2d 730 (1991), in which the court of appeals reversed the trial court's denial of a motion to suppress. In that case, a North Little Rock police officer responding to a telephone call from a woman indicating that her daughter was being held at gunpoint at 1600 North Main, approached a home at 1516 North Main. After knocking and receiving no response, the officer entered the home and found several marijuana plants. *Id*. As the officer stood behind the house, the appellant arrived. In response to the officer's inquiry, he admitted that he was the owner of the home. *Id*. After an officer showed him the marijuana plants and advised him that he could either consent to a search or the officers could go get a search warrant, he admitted the plants were his. *Id*.

The court of appeals held that the initial entry into the appellant's residence, in the absence of probable cause, was in violation of the constitutional guarantees against unreasonable search and seizure. *Id*. Thus, the court held that the appellant's consent to search and the items found as a result of the search were fruits of the

prior illegal search. The court also concluded that the appellant's consent was not freely and voluntarily given in light of the fact that he was confronted with the incriminating evidence and told that if he did not consent they could go get a search warrant. The court equated the situation to that in *Bumper v. North Carolina, supra,* wherein the Supreme Court found coercion where officers falsely claimed to have a search warrant. The situation before us is distinguishable. Here, the officers admittedly had no probable cause, but they began to search only after approaching Mr. Scott and receiving his consent. Moreover, they did not confront him with items found during an illegal search and then attempt to secure his consent.

In *Holmes v. State,* 347 Ark. 530, 65 S.W.3d 860 (2002), this court recently held that consent to the entry of a home was not proven by clear and positive testimony where the evidence showed that the inhabitant of the house, who "appeared to be under the influence," never gave verbal consent but merely opened the door, stepped back, and may have nodded. In that case, we noted that it was not clear whether the inhabitant was inviting the officer in or merely "reacting to the command of a law enforcement officer who . . . was accompanied by at least two other officers who had already taken away the person who resided in the house." *Id.* at 540, 65 S.W.3d at 866. Here, however, there is clear and positive testimony that Mr. Scott verbally consented to the search and then signed a "consent-to-search" form. Furthermore, while the evidence indicates that Mr. Scott was aware of the presence of three officers, two on his porch and one standing to the side of his house in the driveway, we cannot say that the officers had asserted their authority in such a way as to taint Mr. Scott's verbal and written consent to search his residence.

Finally, Mr. Scott claims that it is clear his consent was not voluntarily given based on the following circumstances: (1) Mr. Scott asserts that all three officers put their hands on their guns when he answered the door; (2) the officers told him they had information from someone else that he was making methamphetamine; (3) the officers did not inform him of his right to refuse consent at the time he gave verbal consent; (4) the officers were inconsistent in their testimony as to whether Officer Rounsavall heard or was told of Mr. Scott's verbal consent before leaving to search the back of the home; (5) there was an unexplainable fifteen-minute delay between the arrival of the officers and Mr. Scott's signing of the consent form, as well as inconsistent testimony as to whether the officers had to go to their vehicle to look for a consent form; (6) Mr. Scott insists that he initially declined to sign the

consent form; and (7) Mr. Scott asserts that the officers told him they would get a search warrant and confiscate his property if he did not consent.

▉▉ Once again, in making an independent determination based on the totality of the circumstances, we must view the evidence in the light most favorable to the State and defer to the trial court's assessment of the credibility of witnesses. *Travis v. State*, 331 Ark. 7, 959 S.W.2d 32 (1998); *Laime v. State*, 347 Ark. 142, 60 S.W.3d 464 (2001). In this case, the only evidence of potentially coercive conduct by the officers, *i.e.*, putting their hands on their guns and threatening to take his property, came from Mr. Scott himself, which testimony the trial court was not required to believe. *Dansby v. State*, 338 Ark. 697, 1 S.W.3d 403 (1999). We cannot say that the encounter in question was the result of coercive contact by the police because the police arrived in the middle of the afternoon and knocked on Mr. Scott's door only long enough to wake him from a nap. Also, Mr. Scott was notified that policemen were knocking before he opened the door. The officers informed Mr. Scott about the information they had received and that they were seeking aid in a criminal investigation. As for Mr. Scott's knowledge of his right to refuse consent, this court has stated in *Chism v. State*, 312 Ark. 559, 853 S.W.2d 255 (1993), that knowledge of the right to refuse consent to search is not a requirement to prove the voluntariness of consent.[4] A finding of voluntariness will be affirmed unless that finding is clearly against the preponderance of the evidence. *Id.*

▉▉ It is well settled that any inconsistencies in testimony are for the trier of fact to resolve. *Dansby v. State, supra.* In this case, any inconsistency in the officers' testimony was credibly resolved by the State's witnesses. As to Deputy Rounsavall's knowledge of Mr. Scott's consent, Investigator Foster eventually testified that he thought Deputy Rounsavall was close enough to hear the verbal consent but stated that he also informed Deputy Rounsavall of the consent. As for the fifteen-minute delay, the officers' time of arrival was merely an approximation based upon one officer's glance at his watch as they drove to the residence. Furthermore, Sergeant Moore

---

[4] Likewise, the Supreme Court has said that whether a person is considered to have given voluntary consent is not contingent upon the person's being informed in advance of his right to refuse to give consent. *United States v. Mendenhall*, 446 U.S. 544 (1980). Whether a person had knowledge of the right to refuse consent is recognized as a factor to take into account when determining from the totality of the circumstances whether the person voluntarily consented to the search. *Schneckloth v. Bustamonte*, 412 U.S. 218 (1973).

testified that he did not think the officers were present for fifteen minutes before the consent-to-search form was signed. As we must view the evidence before us in the light most favorable to the State, we also acknowledge that, according to the officers, Mr. Scott never refused consent or declined to sign the written consent form. We, therefore, hold that the State demonstrated by clear and positive evidence that Mr. Scott voluntarily consented to a search of his home.

 In conclusion, police officers do not need reasonable suspicion to approach a citizen in order to ask questions relating to the investigation of a crime. The facts surrounding the "knock and talk" investigation in this case did not amount to a "seizure" in violation of the Fourth Amendment. Accordingly, Mr. Scott's consent to search was not a fruit of the poisonous tree. Additionally, there was clear and positive evidence that Mr. Scott voluntarily consented to a search of his home. Viewing the totality of the evidence in the light most favorable to the State, the trial court's denial of Mr. Scott's motion to suppress was not clearly against the preponderance of the evidence.

Affirmed.

THORNTON and HANNAH, JJ., concur.

JIM HANNAH, Justice, concurring. I agree with the result in this case but write to highlight my concerns about the factual underpinnings of the decision and to note that had this case been decided under our state constitution, I would have reached a different result.

We have recognized that the Fourth Amendment is not implicated when police approach the common entryways of residences, including the rear of a home, for legitimate purposes, including questioning a suspect. See *Miller v. State*, 342 Ark. 213, 27 S.W.3d 427 (2000) (citing *United States v. Anderson*, 552 F.2d 1296 (8th Cir. 1977)). Once there, however, the Supreme Court applies the second of two tests to determine whether a person has been "seized" within the meaning of the Fourth Amendment. This second approach applies when the police approach an individual in a confined space such as a bus, a motel room, or a home. In such a situation, it no longer "makes sense to inquire whether a reasonable person would feel free to continue walking" as is the concern under the first approach to this question. *Florida v. Bostick*, 501 U.S. 429, 435 (1991). Because a person on a bus or in an otherwise confining

space "has no desire to leave" and would wish to remain even if police were not present, "the degree to which a reasonable person would feel that he or she could leave is not an accurate measure of the coercive effect of the encounter." *Id.* at 435-36. When a person's "freedom of movement [is] restricted by a factor independent of police conduct — *i.e.*, by his being a passenger on a bus . . ., the appropriate inquiry is whether a reasonable person would feel free to decline the officers' request or otherwise terminate the encounter." *Id.* at 436; *Michigan v. Chesternut*, 486 U.S. 567, 576 (1988) (seizure occurred if "respondent could reasonably have believed that he was not free to disregard the police presence and go about his business"). Like the person seated on the bus in *Bostick*, a person staying in a motel room or at home has no desire to leave and would remain whether police were present. A person, therefore, is "seized" within the meaning of the Fourth Amendment if a reasonable person would not have felt free to decline. The test, as with the "free to leave" formulation, is an objective one and requires a contextual approach. *United States v. Rodriguez*, 69 F.3d 136, 141 (7th Cir.1995); *United States v. Notorianni*, 729 F.2d 520, 522 (7th Cir. 1984). The determination of whether an encounter is a seizure is made on the basis of the "totality of the circumstances" surrounding the encounter. *Bostick*, 501 U.S. at 437; *Chesternut*, 486 U.S. at 572-73. In making the assessment as to whether a seizure occurred, the circumstances must, of course, be assessed in terms of the values protected by the Fourth Amendment.

It is under these parameters that the facts of this case must be reviewed. Here, Mr. Scott was clearly at his home at the time of the "knock and talk" conducted by the police. Therefore, this court's analysis must focus on whether a reasonable person in Scott's position "would feel free to decline the officers' request or otherwise terminate the encounter." *Bostick*, 501 U.S. at 436. This inquiry, then, is conducted within the confines of the facts of the case, and those facts generally depend on a judgment of the credibility of the witnesses. While we defer to the trial court on such credibility decisions, *see Laime v. State*, 347 Ark. 142, 60 S.W.3d 464 (2001), I take this opportunity to highlight facts that cause me great concern here. First, according to the police officers's testimony and the police report, the officers arrived at Mr. Scott's home at 2:35 p.m., and two officers approached the front door while the third stood to the side of the house in view of the front door. Immediately upon engaging Mr. Scott in conversation, the police indicated that they had information that he was making methamphetamine at his house, and they wanted his consent to search. With the officers's

beginning their questioning with such an accusation, would a reasonable person believe that he was free to disregard the police presence and go about his business? I suspect not.

After this, the police officers's facts become sketchy at best. One officer testified that Mr. Scott agreed to sign a consent form, and the pair of officers stepped inside the house and presented the consent form that they had with them. The second officer at the door testified that they did not have a consent form available, so he had to return to the car and find one. Regardless, the facts indicate that fifteen minutes passed between the initial encounter and Mr. Scott's signing the consent form. So what happened during those fifteen minutes? Because the officers's stories are contradictory, this places the entire fifteen minutes into question, and tends to question whether verbal consent was immediately given. Certainly, Mr. Scott testified that he originally denied the officers's requests for consent to search, but that after they spoke with him for several minutes telling him that they would not confiscate all of his property if he signed the consent form, Mr. Scott signed the form for fear that they would take all of his belongings. This, of course, would explain the passage of a quarter of an hour before written consent was provided for the search. Furthermore, with such a passage of time, the inquiry regarding whether Mr. Scott, again, felt free to disregard the police presence and go about his business is countered with the fact that he felt compelled to stand at his front door for a quarter of an hour discussing the situation with the police before granting written consent to search. As noted, however, the trial court chose to believe the officers here, and we defer to that credibility determination, despite the fact that these officers admittedly went to Mr. Scott's home without any evidence that would constitute even reasonable suspicion to get a search warrant, and admittedly doing so "in hopes of getting a consent to search."

I submit, however, that had this search and seizure been challenged under Article 2, section 15, of the Arkansas Constitution, the outcome may have been different. Here, the court decided this case according to the Fourth Amendment of the United States Constitution, and is bound by federal decisions regarding the search. However, we may interpret our constitution obviously without restrictions from other jurisdictions. And, pursuant to our constitution, I would be inclined in this case to find that the police officers here had no business spending fifteen minutes attempting to gain consent to search. Rather, while Arkansas Rule of Criminal Procedure 2.2 would allow the initial approach by the officers under the facts here, once the defendant denies any involvement in

the alleged crime for which the police have no evidence even to support a reasonable suspicion, contact should cease. The very presence of armed police officers on one's doorstep and at the side of the house, coupled with the bald accusation of drug manufacturing, would cause a reasonable person to feel compelled to continue speaking with those officers rather than feel free to disregard the police presence and close the door. As such, the initial encounter, prior to any signed consent to search, is questionable in this case.

Furthermore, that we perhaps would offer more protection to a defendant in this type of situation under our constitution is evidenced in part by Arkansas Rules of Criminal Procedure 2.2 and 2.3 requiring at least that police officers may not assert that compliance with their requests is required, and at the greatest that they must advise a defendant of his right to refuse compliance with the request for information. Certainly, under Rule 2.3 "Warning to persons asked to appear at a police station," a law enforcement officer must "take such steps as are reasonable to make clear that there is no legal obligation to comply with such a request." Rule 2.2 "Authority to request cooperation," also requires that "no law enforcement officer shall indicate that a person is legally obligated to furnish information or to otherwise cooperate if no such legal obligation exists." The commentary to these rules indicates that some notice that compliance is not required should be given to the person being questioned. This is particularly important under Rule 2.2 where multiple officers, armed with weapons, spouting accusatory questions, and circling the house, may approach a person's home to assert allegations for which they have no actual proof.

At least two other states have interpreted their state constitutions to require police officers conducting a "knock and talk" to inform a person that he may refuse consent, revoke consent, or limit the scope of consent, see State v. Ferrier, 960 P.2d 927 (Wash. 1998), or to at least get a "knowledgeable waiver" from the person indicating that he was informed that he has a right to refuse to give consent, and must be cognizant of his rights in the premises, see Graves v. State, 708 So.2d 858 (Miss. 1997). These decisions were based on the search and seizure provisions in Washington's and Mississippi's constitutions. These provision are substantially similar to both the Fourth Amendment and to Article 2, section 15, of the Arkansas Constitution, and contain no specific directive requiring officers to inform defendants of the right to refuse consent. While I am cognizant of the fact that we have stated that we interpret Article 2, section 15, as the Supreme Court interprets the Fourth Amendment, see Rainey v. Hartness, 339 Ark. 293, 5 S.W.3d 410

(1999), this new breed of search and seizure law, the "knock and talk," warrants our departure from federal examples where the citizens of Arkansas face yet another attack limiting the protection of their homes against unlawful intrusion.

THORNTON, J., joins in this concurrence.