James Patrick KEENOM v. STATE of Arkansas

CR 01-673                                    80 S.W.3d 743

Supreme Court of Arkansas
Opinion delivered June 20, 2002

[Petition for rehearing denied September 5, 2002.*]

---

[1] The U.S. District Court's dismissal order was later affirmed by the Eighth Circuit Court of Appeals.

* GLAZE, J., dissenting. See 349 Ark. 399.

*Taylor Law Firm,·* by: *W.H. Taylor* and *John Mikesch,* for appellant.

*Mark Pryor,* Att'y Gen., by: *Valerie L. Kelly,* Ass't Att'y Gen., for appellee.

RAY THORNTON, Justice. At approximately 7:30 p.m. on March 7, 2001, Detective David Jones, of the 19th Judicial District Drug Task Force was off-duty and conducting personal business at the Wal-Mart Supercenter in Bentonville, when he saw a man he considered to appear suspicious, because of his long hair and beard, and because he was pushing a cart containing chemicals that might be used in the manufacture of methamphetamine, including two cans of acetone, several bottles of rubbing alcohol, and several packages of coffee filters.

Detective Jones followed the suspicious customer, appellant James Patrick Keenom, to the parking lot and took his license plate number, which he later checked through the ACIC to determine the man's identity and address. He watched appellant return to the store and talk to another man the detective considered to look suspicious because he had long hair and was holding "Heet" brand fuel cleanser and camping fuel. Detective Jones then watched appellant leave the store and drive away.

Detective Jones called Detective Tony Noblin, also of the 19th Judicial District Drug Task Force, and told him what he had seen. The two decided to go to appellant's residence and perform a "knock and talk" to see if they could acquire consent to search and to see if they could catch him in the act of manufacturing. Detective Noblin testified that they knew they could not obtain a warrant for a nighttime search based on the information they had, and the only way to get on appellant's property was to do a "knock and talk." The officers drove to the Decatur Police Department to get directions to the address. The officers and detectives arrived at the main residence on the property located on a rural, dirt road about six miles outside Decatur and saw appellant enter a house. They did not smell methamphetamine cooking, so they left and went back to the Decatur Police Department to get the officers to come with them. They also decided that because they were shabbily dressed in plain clothes, they should be accompanied by members of the Decatur Police. At the suppression hearing, the detectives testified that they wanted officers with them who could appear in uniforms so as not to unduly frighten the residents when the detectives came to the door. They also admitted that they wanted the officers with them because it was

nighttime, there was a greater likelihood of someone getting hurt, and there were issues of "officer safety."

At 11:30 p.m., the officers and detectives caravanned to the house they believed to be appellant's residence. They knocked on the door of the house and were met by appellant's mother, Frances Keenom. They asked for her son, and she explained that he lived in a trailer house further into the property, approximately 700 feet east of her home. She did not give consent to the police to proceed further into her property, and made no further comment. The police proceeded further into the property to reach appellant's trailer house, passing several chicken houses and other structures, and passing "no trespassing" signs that they stated they did not see.

The facts concerning exactly what transpired after the police arrived at appellant's trailer are disputed. When the officers arrived at appellant's trailer, all agree that he met them outside before they could knock on the door. Appellant testified that their headlights awakened him, and that he only had time to put on a pair of jeans before stepping outside to meet them. The officers stood by their cars with their lights shining on appellant's front door, while the detectives approached appellant, coming within ten feet of him. Appellant was barefoot and wearing only his britches when asked by Detective Jones for permission to search the trailer. All agree that appellant refused to consent. He suggested to the police that they leave and come back in ten minutes, but they responded that they could not do that. The officers remained and continued to question appellant. Appellant testified that during this questioning, he requested to go inside because it was storming and cold and that the police refused to let him return to his trailer and threatened to take all of his belongings if he tried to go inside. Appellant also testified that they did allow him to go to his car to get a jacket, and this testimony was not challenged. After an unspecified amount of questioning, appellant admitted that he had a quarter of a gram of methamphetamine inside the trailer, and at that point Detective Jones testified that Detective Noblin apprised him of his *Miranda* rights because he had begun to implicate himself in criminal activity. Appellant denied that he was read his *Miranda* rights. Detective Jones contin-

ued to question him and asked appellant if he had some kind of lab operation in his trailer. Appellant responded that he had accepted payment from his friends on previous occasions to allow them to manufacture methamphetamine in his trailer. At that point, after anywhere from twenty to forty-five minutes of questioning, the detectives arrested him for conspiracy to manufacture methamphetamine. The detectives denied that they ever took him into custody before that point. The detectives did not deny that they refused to allow him to go back inside his trailer, but they denied that they threatened appellant.

After arresting appellant, the detectives entered and made a sweep of the residence on the grounds that they had seen the curtains moving while they were talking with appellant, and because they thought a lab might be in operation at that moment. Apparently, they did not consider this "sweep" to be a search because Detective Jones testified that they were only in the trailer a minute or two to make sure there would be no explosion from a meth lab left cooking and that no one was inside the trailer. Detective Jones testified that appellant consented to a search after he was arrested, but that the detectives believed it would be appropriate to go get a search warrant at that time. Detective Noblin testified at the suppression hearing that after Detective Jones left the scene with appellant, he did not try to obtain a nighttime search warrant, and that when they were out at appellant's trailer, they were doing something "that the magistrate would not have let us do if we had gone to the magistrate."

Detective Noblin stayed at the residence with one of the uniformed officers to secure the area while Jones obtained a search warrant from Judge Schrantz in Rogers. The magistrate required that they not serve the search warrant until daybreak, and so it was served at the residence at 6:05 a.m. the next morning. As a result of the search, the officers reported finding weapons, drug paraphernalia, and lab materials, and appellant was charged with manufacturing methamphetamine and simultaneous possession of drugs and firearms.

Appellant moved for suppression of the evidence obtained from the search on the grounds that they were obtained in viola-

tion of his Constitutional rights. That motion was denied after a hearing and appellant changed his plea from "not guilty" to a "conditional guilty plea." He reserved the right to appeal from an adverse judgment of the motion to suppress evidence, ensuring that if he prevailed upon appeal he would be allowed to withdraw his guilty plea. The trial court found appellant guilty and he was sentenced to twenty years' imprisonment in the Arkansas Department of Correction, five years of which was suspended upon certain conditions. We conclude that appellant was denied his rights under the Fourth Amendment to the United States Constitution to be free from unreasonable search and seizure, and we reverse.

We first address appellant's argument that his Fourth Amendment rights were violated by the search and seizure performed by the State. We review the lower court's ruling by making an independent determination based on the totality of the circumstances and viewing the evidence in the light most favorable to the State. *Griffin v. State*, 347 Ark. 788, 67 S.W.3d 582 (2002). This court will reverse only if the trial court's ruling is clearly against the preponderance of the evidence. *Burris v. State*, 330 Ark. 66, 954 S.W.2d 209 (1997).

In Arkansas, "knock and talk" is a label for a procedure that is defined as follows:

> Absent express orders from the person in possession against any possible trespass, there is no rule of private or public conduct which makes it illegal per se, or a condemned invasion of the person's right of privacy, for anyone openly and peaceably, at high noon, to walk up the steps and knock on the front door of any man's "castle" *with the honest intent of asking questions* of the occupant thereof whether the questioner be a pollster, a salesman, or an officer of the law.

*Griffin, supra.* (Emphasis added.) (citing *Davis v. United States*, 327 F.2d 301, 303 (9th Cir. 1964)).

Our recent decision in *Scott v. State*, 347 Ark. 767, 67 S.W.3d 567 (2002), sets out the standard for determining when a "knock and talk" investigation becomes a seizure for purposes of Fourth Amendment analysis. We said:

[a] seizure does not occur simply because a police officer approaches an individual and asks a few questions. *Id.* A seizure occurs when a reasonable person would not feel "free to leave." *Michigan v. Chesternut*, 486 U.S. 567 (1988). The "free to leave" analysis, however, is not an accurate measure of the coercive effect of an encounter in situations where a person would have no desire to leave, such as where the person is seated on a bus. *Florida v. Bostick*, 501 U.S. 429. "In such a situation, the appropriate inquiry is whether a reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter." *Id.* The crucial test is whether, taking into account all circumstances, the police conduct would have communicated to a reasonable person "that he was not at liberty to ignore the police presence and go about his business." *Id.* (citing *Michigan v. Chesternut, supra.*) It is important to note that the "reasonable person" test presupposes an innocent person. *Id.*

*Scott, supra.* Though the "knock and talk" procedure is not automatically violative of the Fourth Amendment, it can become so. In *Scott* we held that the test to determine if a "knock and talk" encounter reached the level of a seizure for the purposes of the Fourth Amendment was whether a reasonable person would feel free to terminate the encounter. *Id. The crucial test is whether, taking into account all circumstances, the police conduct would have communicated to a reasonable person "that he was not at liberty to ignore the police presence and go about his business." Id.* (citing *Michigan v. Chesternut, supra*). (Emphasis added). It is important to note that the "reasonable person" test presupposes an innocent person. *Id. Scott, supra.* In our review of federal appellate court decisions holding that the "knock and talk" procedure is not *per se* violative of the Fourth Amendment, we also noted a word of warning: "police must realize the inherent limitations in the more informal way of proceeding." *Id.* (citing *United States v. Jerez*, 108 F.3d 684 (7th Cir. 1997)). As stated above, the test to determine if a "knock and talk" encounter has become a seizure is whether a reasonable person would feel free to terminate the encounter. *Scott, supra.*

In the instant case, it is undisputed that appellant asked the officers to leave and come back later. Officer Noblin stated that "Keenom told us to leave and come back in ten minutes." When asked on cross-examination whether the officers complied with

that request, Officer Noblin conceded that they did not. Similarly, appellant testified that during his encounter with the officers he asked to return to the house to retrieve some clothing and was denied the opportunity to reenter the house. The State's witnesses did not controvert this testimony, but Officer Noblin suggested that the officers would have had no choice but to leave the premises if appellant had gone inside his house. The undisputed fact remains that the officers did not leave the premises. They continued to question appellant for a period of twenty to forty-five minutes, depending upon which of the State's witnesses' testimony is credited.

Even viewing the evidence in the light most favorable to the State, we conclude that a reasonable person in appellant's position would not have felt free to terminate the encounter with the police and return to the safety and privacy of his house. Officer Noblin's testimony does not controvert appellant's statement that he was not allowed to go inside to retrieve some clothing. Similarly, his request that the officers leave and come back in ten minutes was ignored. Instead, these officers continued to question him while he stood in the weather, partially clothed, under the glare of the headlights of the officers' cars. This persistence by the officers would strongly convey to a reasonable person the officers' intention not to desist. Officer Noblin's subjective knowledge that the officers would had no choice but to leave if appellant had gone inside his home is simply irrelevant to the inquiry. This is merely an acknowledgment that the officers had no probable cause to arrest appellant.[1] Furthermore, even giving deference to the trial court's position as the finder of fact concerning what amounted to reasonable suspicion, there is insufficient

---

[1] Compare the analogous inquiry in Fifth Amendment violation analysis that the United States Supreme Court set out in *Stansbury v. California*, 511 U.S. 318 (1994). The Court stated:

> an officer's view concerning the nature of an interrogation, or beliefs concerning the potential culpability of the individual being questioned, may be one among many factors that bear upon the assessment whether that individual was in custody, but *only if the officer's views or beliefs were somehow manifested to the individual under interrogation and would have affected how a reasonable person in that position would perceive his or her freedom to leave.*

*Id.* (Emphasis added).

evidence to hold that the officer had reasonable suspicion to do more than stop appellant simultaneously with his observation of the "suspicious" seeming appellant. *United States v. Hensley*, 469 U.S. 221 (1985). *Terry v. Ohio*, 392 U.S. 1 (1968). There certainly were no grounds for the officer to witness suspicious behavior in Bentonville, ascertain the appellant's identity, obtain the assistance of other officers, caravan to the appellant's rural residence six miles outside Decatur, attempt to obtain the appellant's consent to conduct a search of his residence, and, finally, after being refused consent, engage in a twenty- to forty-five-minute detention of appellant on the theory of an investigatory stop.

■ ■ The persistence of the officers may be the functional equivalent of physical restraint, which, in the absence of justification, is proscribed by the Fourth Amendment. *See, U.S. v. Jerez, supra; U.S. v. Wilson*, 953 F.2d 116 (4th Cir. 1991). Under the totality of the circumstances in this case, the officers exceeded the inherent limitations of the "knock and talk" procedure. Their persistence in the face of appellant's efforts to terminate the encounter and his request that the officers leave, resulted in his being seized in violation of his Fourth Amendment rights. Such prolonged questioning, leading as it did to appellant's unsuccessful attempts to return to the safety and solitude of his house, would surely lead a reasonable person to believe that he could not ignore the officers. The safety and sanctity of the home is shielded by the Fourth Amendment. Though the "knock and talk" procedure is not *per se* violative of the Fourth Amendment, the police must conduct themselves in a manner that does not communicate to a a reasonable person that he or she is not free to ignore the police presence. *Scott, supra.*

■ Following our determination that appellant was unlawfully seized under the Fourth Amendment, we must consider whether the contraband seized from the execution of the search warrant should be suppressed. We conclude that *Wong Sun v. United States*, 371 U.S. 471 (1963), controls the analysis of this issue. In that case, the Supreme Court stated in its holding that:

> We need not hold that all evidence is "fruit of the poisonous tree" simply because it would not have come to light but for the illegal actions of the police. Rather, the more apt question in

> such a case is "whether, granting establishment of the primary illegality,· the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." Maguire, Evidence of guilt, 221 (1959). We think it clear that the narcotics were "come at by the exploitation of that illegality" and hence that they may not be used against Toy.

*Id.* This holding represents the general policy that "knowledge gained by the Government's own wrong cannot be used by it in the way proposed." *Silverthorn Lumber Co. v. United States*, 251 U.S. 385 (1920). The policies of this rule do not make any logical distinction between physical and verbal evidence. *Wong Sun, supra.* The Supreme Court in *Wong Sun* stated that "verbal evidence which derives so immediately from an unlawful entry and an unauthorized arrest as the officer's action in the present case is no less the 'fruit' of official illegality than the more common tangible fruits of the unwarranted intrusion." *Id.*

█ The search warrant executed in this case was based upon the statements made by appellant to the officers following his illegal seizure. There was no break in time between the events leading up to appellant's arrest and the inculpatory statements he made that led to the issuance of the search warrant. In other words, the primary taint of the unlawful seizure had not been sufficiently attenuated or purged. Under these circumstances, the fruits of the warrant were poisoned by the officers' unlawful conduct in seizing appellant. Accordingly, we conclude that appellant was deprived of his Fourth Amendment rights and the evidence should have been suppressed.

Appellant also contends that the detectives conducted a custodial interrogation, violating his Fifth Amendment rights. The State argues that appellee failed to preserve this issue for appeal, or alternatively, that appellant was not in custody before he was read his Fifth Amendment *Miranda* rights. Because we hold that appellant's Fourth Amendment rights were violated and the evidence should have been suppressed as "fruit of the poisonous tree," we need not address the issue of appellant's Fifth Amendment rights.

Because the detectives performed an unreasonable search and seizure, we conclude that appellant was deprived of his Fourth Amendment rights and that the evidence should have been suppressed.

Accordingly, we reverse.

GLAZE and BROWN, JJ., dissent.

TOM GLAZE, Justice, dissenting. The appellant, James Keenom, argues in this appeal that his Fifth Amendment rights were violated. In particular, Keenom never argued that issue, nor did he obtain the court's ruling on the constitutional issue.[1]

Keenom spends considerable time discussing an "0-1" form, which he abstracts as reflecting, "the defendant intends to suppress evidence on the grounds of illegal search and arrest, and he intends to suppress admissions on the grounds of: coercion; violation of Miranda; and unlawful arrest." Apparently, this is a preliminary form counsel and the trial judge signed after Keenom was arraigned and prior to other pretrial matters and hearings.

Arkansas law is well settled that an appellant must raise and make an argument at trial in order to preserve it on appeal, *see Halford v. State*, 342 Ark. 81, 88, 27 S.W.3d 346, 351 (2000), and even constitutional issues must first be presented below to be preserved for appellate review. *See Nance v. State*, 339 Ark. 192, 200, 4 S.W.3d 501, 506 (1999).

Here, Keenom and the State filed briefs, wherein they addressed the legality of the officers' "knock and talk" procedure used to search Keenom's trailer. It was this "knock and talk" issue the trial judge considered in ruling that the State's search was valid. The judge made no mention of coercion or the violation of Miranda on the officers' parts. Nor was the judge asked to rule on any custodial issue that may have ensued at the time Keenom

---

[1] The majority opinion apparently agrees that Keenom failed to preserve this Fifth Amendment issue, since that opinion does not discuss it in reaching its decision.

admitted that he possessed a quarter of a gram of methamphet-amine.[2]

In this case, as in many, a defendant is confronted with choosing his defenses as the case evolves. Understandably, in these circumstances, Keenom chose to question the officers' knock and talk decision in going out to Keenom's trailer at 11:30 at night, rather than trying to show coercion — an element which, on the evidence shown, would have been difficult, to say the least.

In reviewing a ruling denying a defendant's motion to suppress, this court makes an independent determination based on the totality of the circumstances and views the evidence in the light most favorable to the State, and will reverse only if the trial court's ruling is clearly against the preponderance of the evidence. *Griffin v. State*, 347 Ark. 788, 67 S.W.3d 582 (2002). Our court defers to the trial court in assessing witness credibility. *Id.*

In looking at the evidence in favor of the State, as this court is required to do, the officers drove to Keenom's trailer by way of a dirt road[3] in order to talk to Keenom concerning Detective David Jones's observations and investigation of Keenom's earlier purchase and possession of items known to be used in the manufacture of methamphetamine.[4] *See Embry v. State*, 70 Ark. App. 122, 15 S.W.3d 367 (2000) (court held there is no expectation of privacy in driveways, which are commonly used by visitors to approach dwellings). Keenom saw the officers' cars approaching his trailer,

---

[2] To the contrary, the trial judge, in ruling on the validity of the officers' knock and talk procedure, relied on the officers' observations as being reasonable when "going out and doing the so-called knock and talk." Attached is a copy of the trial court's findings and ruling on Keenom's motion to suppress.

[3] The majority writes the police passed "no trespassing" signs that they stated they "did not see." The only evidence of these signs is the testimony of Keenom and his mother. The photographs of his property that Keenom entered into evidence were not taken until after the night of the incident. The trial judge resolves matters of credibility. *Scott v. State*, 347 Ark. 767, 67 S.W.3d 567 (2002).

[4] Officer Jones also testified that he observed Keenom at Wal-Mart with another man who was buying Heet brand fuel cleanser and two containers of camping fuel. The majority notes the items that the second man purchased, but does not mention that Jones identified the items as precursors to methamphetamine production.

and he walked out to meet them. It was about 11:30 p.m. Keenom had his lights on in his home.

Officer Jones, accompanied by three other officers, told Keenom that he had seen Keenom that day purchase items at Wal-Mart that could be used to make methamphetamine and asked for consent to search his trailer. Keenom refused. They talked a few seconds longer, and Keenom said he would feel better about the officers searching if he first could have ten minutes in the trailer. They continued to talk and Detective Jones asked whether methamphetamine was inside the trailer. Keenom said that there was approximately a quarter of a gram. Keenom then added he might have parts of a lab inside his residence because his friends sometimes paid him to use his trailer to manufacture methamphetamine. After Keenom volunteered this information, the officers Mirandized Keenom, arrested him, and Keenom consented to the search of his trailer. Keenom testified that the interview between him and the officers took approximately twenty minutes.[5] Officer Noblin testified that, if Keenom had gone back inside his trailer, "[w]e would have loaded up . . . our cars and left."

Under the circumstances of this case, the trial court could have reasonably found that the only evidence of coercive conduct by the officers came from Keenom and that a reasonable person could have felt free to terminate the encounter by going inside his trailer. *See Scott v. State*, 347 Ark. 767, 67 S.W.3d 567 (2002). As previously indicated, Keenom was awake and his lights were on at 11:30 p.m., and he was aware that there were cars on their way to his home when he walked out of his house to meet them. The officers departed their cars and immediately told Keenom why

---

[5] The majority opinion relies on some testimony that this interview period lasted as long as forty-five minutes, but Keenom said the time span was about twenty minutes. The trial court could have believed his version, which makes the period shorter and reasonable. Certainly, this short twenty-minute period can hardly be an unlawful functional equivalent of physical restraint, as the majority opinion suggests. In addition, the opinion reflects the belief in Keenom's testimony that Keenom was denied the right to go inside his home to retrieve some clothing, and expresses belief in Keenom's story that the officers refused to let him return to his trailer or allow him to get his jacket, concluding Keenom's testimony went unchallenged. The trial court simply was not required to believe Keenom's testimony on those evidentiary issues. *Scott*, 347 Ark. 767, 67 S.W.3d 567.

they were there, but after about twenty minutes of questioning, he admitted he possessed methamphetamine, he had items that he and friends could use to make methamphetamine, and people paid him for use of his trailer to manufacture methamphetamine.

Having concluded that the officers' actions were not coercive or unreasonable, the issue then centers upon a search incident to arrest. Keenom was lawfully arrested upon his admitting possessing methamphetamine and having assisted others in the manufacturing of methamphetamine. Because the officers' actions were lawful and resulted in their acquiring contraband in Keenom's possession, the judge's ruling to deny Keenom's suppression motion was correct. *See Wong Sun v. United States*, 371 U.S. 471 (1963). I would affirm.

THE COURT: This -- you need to be clear about one thing. A late night knock and talk is presumably unreasonable. I think you can -- you start from the idea that going out to someone's property in the middle of the night to do -- to conduct an interview, and that's what a knock and talk is, is presumably unreasonable. So, there has to be some more to it that allows that to occur.

Obviously, I don't think these officers, either one of them, made any bones about the fact that they

believed that -- that -- that methamphetamine was being cooked that night and their purpose in going out there was to see if it was, in fact, occurring. I don't think there's any doubt about that. So, the purpose -- it wasn't just to go out and conduct an interview as we ordinarily think of an interview.

What seems -- what's persuasive to this Court in this particular case, one is the Miller case. And you-all have read the Miller case and it -- and that's the most recent word from the Arkansas Supreme Court on this issue of going onto people's property in a -- for the purpose of conducting an interview or a knock and talk.

I'm not -- now, one of the distinctions in the Miller case and in this case, I can tell you that there wouldn't have been any issue whatsoever if this had been earlier in the evening, as far as I can tell. What makes this one a little bit more egregious is the fact that it occurred in the middle of the night, which puts a greater burden on the State to have a basis for going out there and doing it.

I can tell you if this had been a case where these officers were based -- basing their decision to do this on -- on a confidential informer passing information the results would be different. But what distinguishes this case in the Court's mind and -- is the fact that

the -- this decision was based on the observations of the officer, the personal observations of the officer.

And essentially what we had here was the officer making an observation, first of all, that -- that -- that there were -- that Mr. Keenom had in his possession at Wal-Mart some precursors to -- to -- to methamphetamine and nothing else. Wasn't any groceries in there, wasn't any household goods in there, it was just those items.

Now, those items obviously have legitimate purposes as all people know. And the fact that after these were taken out and purchased and taken out to the truck, then -- then the individual returned and more items that are precursors were purchased.

So, based on those observations of the officers, then -- that officer, the Court finds that there was a reasonable basis for their -- his belief and the belief of the officers that methamphetamine was being manufactured that evening and that -- and that they had a basis -- a reasonable basis for going out and doing the so-called knock and talk. So, the motion to suppress is denied.

MS. KOTOUC: Thank you, Your Honor.

ROBERT L. BROWN, Justice, dissenting. This case involves a *failed* knock-and-talk. Police officers went to Keenom's trailer at 11:30 p.m. after observing him four hours earlier twice buy known ingredients for "cooking" methamphetamine at Wal-Mart. Each time, Keenom only made meth-related purchases. The police officers talked to Keenom outside his trailer for twenty to forty-five minutes. He refused to consent to a search of his trailer, and the police officers honored that. During the questioning, Keenom asked if he could reenter his trailer for ten minutes before consenting to a search. The police officers answered that he could not. The police officers did allow him to retrieve a jacket from his car. One police officer testified that had Keenom simply gone back into his trailer, the police officers would have left. During the questioning, Keenom admitted that he had a quarter of a gram of methamphetamine inside the trailer. The police officers left and obtained a search warrant for the trailer, which they subsequently executed.

It is first important to acknowledge what is not at issue in this appeal. First, a violation of *Miranda v. Arizona*, 384 U.S. 436 (1966) is not preserved for our review, because no ruling on this issue was obtained from the trial court. Secondly, a violation of Article 2, section 15 of the Arkansas Constitution dealing with unreasonable searches and seizures is not at issue here, because the Arkansas Constitution was not sufficiently raised below and no ruling was obtained from the trial court. Indeed, there is only a passing reference to the Arkansas Constitution in Keenom's brief before this court, and no effort was made to argue that Arkansas jurisprudence provides more rights to individuals against unreasonable searches and seizures than does the Fourth Amendment to the U.S. Constitution. *See, e.g., State v. Sullivan*, 348 Ark. 647, 74 S.W.3d 215 (2002). This court, of course, cannot afford greater rights to individuals under the U.S. Constitution than those permitted under federal law. *Arkansas v. Sullivan*, 532 U.S. 769 (2001).

As a result, our analysis in this case is limited to the Fourth Amendment and whether a violation occurred under federal law. I conclude that it did not, because I conclude the police conduct in this case was reasonable based on what the police officers

observed at Wal-Mart and based on the fact that they never conducted a search of Keenom's trailer based on consent. Instead, they obtained a search warrant.

A major deficiency in the majority's analysis is that it never acknowledges the trial court's findings relating to the reasonableness of the police conduct in this case and never engages in a clearly-erroneous assessment of those findings. This, of course, is required by our caselaw. *See, e.g., Burris v. State*, 330 Ark. 66, 954 S.W.2d 209 (1997). What follows is the trial court's ruling on the subject:

> I can tell you if this had been a case where these officers were based—basing their decision to do this on—on a confidential informer passing information the results would be different. But what distinguishes this case in the Court's mind and—is the fact that the—this decision was based on the observations of the officer, the personal observations of the officer.
>
> And essentially what we had here was the officer making an observation, first of all, that—that—that there were—that Mr. Keenom had in his possession at Wal-Mart some precursors to—to—to methamphetamine and nothing else. Wasn't any groceries in there, wasn't any household goods in there, it was just those items.
>
> Now, those items obviously have legitimate purposes as all people know. And the fact that after these were taken out and purchased and taken out to the truck, then—then the individual returned and more items that are precursors were purchased.
>
> So, based on those observations of the officers, then—that officer, the Court finds that there was a reasonable basis for their—his belief and the belief of the officers that methamphetamine was being manufactured that evening and that—and that they had a basis—a reasonable basis for going out and doing the so-called knock and talk. So, the motion to suppress is denied.

This court has shown a sensitivity to abuses caused by nighttime searches, which I share. *See* Ark. R. Crim. P. 13.2; *Fouse v. State*, 337 Ark. 13, 989 S.W.2d 146 (1999); *Garner v. State*, 307 Ark. 353, 820 S.W.2d 446 (1991). I further am of a mind to require that consent-to-search forms be executed by the resident before a knock-and-talk can be effected, whether during the daytime or at night. *See Griffin v. State*, 347 Ark. 788, 67 S.W.3d 582

(2002) (Brown, J., concurring). But this criminal rule and our caselaw have their foundation in the Arkansas Constitution, not the Fourth Amendment. Again, the instant case is solely a Fourth Amendment case, and federal jurisprudence does not require the exigent circumstances for a nighttime search warrant set out in our Rule 13.2, much less that those exigent circumstances be required for a nighttime knock-and-talk.

Turning to the conduct of the police officers in the case at hand, I cannot disagree with the majority that the police strategy of coming out *en masse* to Keenom's trailer late at night was highly questionable. But the issue for us to resolve is whether that conduct was unreasonable under the Fourth Amendment in light of what the police officers observed at Wal-Mart and in light of the fact they did not search based on consent but ultimately obtained a search warrant. I believe their conduct was reasonable under federal law.

Even if the majority is correct that Keenom was "seized" during the twenty-minute interrogation because a reasonable person would have not believed he was free to leave, *see Michigan v. Chesternut*, 486 U.S. 567 (1988), that does not end our analysis. The question is whether the seizure was reasonable. The majority concludes that the police officers would not let Keenom return to his trailer. Yet, that was a matter of dispute. Keenom wanted ten minutes alone inside his trailer *prior to giving his consent to search.* The officers refused. This was not unreasonable in my judgment. Police officers have a legitimate interest in officer safety, and there was no assurance that Keenom did not have a weapon in his trailer. *New York v. Quarles*, 467 U.S. 649 (1984). Moreover, there was always the risk that Keenom would destroy evidence of methamphetamine production which would render a consent to search ten minutes later meaningless. The pivotal point, however, is that Keenom never simply turned around and went back into his trailer. He was free to do so, and had he done so, Officer Noblin testified that the police officers would have left.

The majority weighs the evidence, assesses credibility, and concludes otherwise. But that is precisely what this court should not do. Credibility is for the trial court to weigh. *See, e.g., Hale v.*

*State*, 343 Ark. 62, 31 S.W.3d 850 (2000); *Pyle v. State*, 340 Ark. 53, 8 S.W.3d 491 (2000). We defer to the trial court in resolving conflicts in testimony and only reverse when the trial court's findings are clearly erroneous. *See Burris v. State, supra.*

The question of whether under federal cases, the police conduct in this case would pass muster is not really debatable. *See, e.g., Rogers v. Pendleton*, 249 F.3d 279 (4th Cir. 2001); *United States v. Jones*, 239 F.3d 716 (5th Cir. 2001); *United States v. Cormier*, 220 F.3d 1103 (9th Cir. 2000); *United States v. Johnson*, 170 F.3d 708 (7th Cir. 1999); *United States v. Heath*, 58 F.3d 1271 (8th Cir. 1995). In addition, we recently discussed a knock-and-talk procedure where illegality under the Fourth Amendment was the issue and where trial counsel failed to preserve the state constitutional issue. *See Scott v. State*, 347 Ark. 767, 67 S.W.3d 567 (2002). In *Scott*, we affirmed the knock-and-talk procedure employed and reiterated the general balancing test that is the starting point in evaluating police-citizen encounters under the Fourth Amendment:

> The approach of a citizen pursuant to a policeman's investigative law enforcement function must be reasonable under the existent circumstances and requires a weighing of the government's interest for the intrusion against the individual's right to privacy and personal freedom. To be considered are the manner and intensity of the interference, the gravity of the crime involved, and the circumstances attending the encounter.

*Scott*, 347 Ark. at 776 (citing *State v. McFadden*, 327 Ark. 16, 938 S.W.2d 797 (1997)).

In short, the Fourth Amendment does not preclude what the police officers did in this case. No consent to search was given. The search only occurred after a search warrant was obtained. The search warrant was based on Keenom's admission that he had a quarter of a gram of methamphetamine in his trailer, which admission resulted from his questioning by the police. Yet, the questioning was the result of the police officers' personal observations at Wal-Mart. Viewing the proof in the light most favorable to the State, as we are required to do, that questioning lasted twenty minutes, and Keenom was not preventing from going back into the trailer and shutting his door. Had he done so, the police officers said they would have left. What the police officers did

object to was Keenom's being allowed to be in his trailer alone for ten minutes before consenting to a search.

I conclude, as did the trial court, that the police officers' interrogation of Keenom was reasonable under the Fourth Amendment after the police officer's observation of the meth-related purchases. I would affirm.

DISSENTING OPINION ON DENIAL OF REHEARING
DELIVERED SEPTEMBER 5, 2002

TOM GLAZE, Justice, dissenting. The majority opinion clearly erred in its application of the standard of review. As the State points out in its petition for rehearing, the majority opinion resolved several factual disputes by considering the evidence in the light most favorable to the appellant, Keenom, despite our consistent holdings that the evidence on appeal is to be viewed in the light most favorable to the appellee. *See, e.g., Britt v. State*, 344 Ark. 13, 38 S.W.3d 363 (2001); *Benson v. State*, 342 Ark. 684, 30 S.W.3d 731 (2000). For example, the majority opinion relies heavily on conflicting testimony that the officers' interview of Keenom lasted as long as forty-five minutes, but Keenom's own testimony reflected that the time span was about twenty minutes. Further, this court's opinion reflects the belief that Keenom was denied the right to go inside his home to retrieve some clothing, and expresses a belief in Keenom's statement that the officers refused to let him return to his trailer, thus concluding that Keenom's testimony went unchallenged. However, there was absolutely nothing coercive or confrontational about this encounter between Keenom and the officers that would have prevented Keenom from terminating their exchange and going inside his residence. In fact, in oral argument, Keenom agreed that the officers denied Keenom's testimony that he asked to go back inside his residence. The trial court is the ultimate arbiter of questions of credibility, *see Green v. State*, 334 Ark. 484, 978 S.W.2d 300 (1998), and it was not required to believe Keenom's testimony on those evidentiary issues. Because the majority clearly and erroneously applied the standard of review in Keenom's favor, I would grant rehearing in this case.