Carl Allen JOHNSON  *v.*  STATE of Arkansas

CR 05-45                                     215 S.W.3d 668

Supreme Court of Arkansas
Opinion delivered October 13, 2005

[Rehearing denied November 17, 2005.]

*Cullen & Co., PLLC*, by: *Tim Cullen*, for appellant.

*Mike Beebe*, Att'y Gen., by: *Brad Newman*, Ass't Att'y Gen., for appellee.

TOM GLAZE, Justice. Appellant Carl Johnson was convicted of second-degree murder in the killing of Mark "Calvin" Cahoon on March 15, 2002. Johnson's co-defendant, Rebecca Woolbright, was convicted of first-degree murder. On appeal, this court affirmed Woolbright's conviction and sentence, but reversed Johnson's conviction on the grounds that his constitutional rights had been violated when officers failed to inform Johnson that he had the right to refuse to consent to the officers' request to search the hotel room in which Johnson resided at the time. *See Woolbright v. State*, 357 Ark. 63, 160 S.W.3d 315 (2004).

In the *Woolbright* opinion, this court noted that, after the officers' illegal entry, the following transpired:

> Detective Reese searched the room and seized a pair of jeans. ... With Mr. Johnson's consent, Detective Sutton seized a pocket knife. ...
>
> At the police station, Mr. Johnson was taken to a work cubicle for questioning. Detective Reese noticed that his wristwatch appeared to have a red stain on it and [he] seized it. Another officer later seized Mr. Johnson's boots [and other items of clothing]. Thereafter, Ms. Woolbright came to the police station and gave a statement implicating Mr. Johnson in the murder. At this point, Mr. Johnson was taken into custody and placed under arrest. Officer Daniel Grubbs secured Mr. Johnson while the other officers went ... to search for the victim's body. During a routine pat-down search, the officer seized a set of keys.

*Id.* at 79. The *Woolbright* court continued as follows:

> We have recently addressed the propriety of the "knock-and-talk" procedure under the protections of the Arkansas Constitution.

*See State v. Brown*, 356 Ark. 460, 156 S.W.3d 722 (2004). In that case, we held that a home dweller must be advised of his or her right to refuse consent in order to validate a consensual search under the Arkansas Constitution. *Id.* It is undisputed that none of the officers informed Mr. Johnson that he had the right to refuse consent to the entry and subsequent search of his home. Accordingly, we must reverse and remand for the *suppression of all evidence that flowed from this unconstitutional search.*

*Id.* at 80 (emphasis added).

Upon remand, Johnson again filed a motion to suppress the evidence. In his motion, Johnson cited portions of Justice Thornton's dissenting opinion in *Woolbright*, in which Justice Thornton referred to "the items that were seized" as being "a pair of jeans, a pocket knife, Johnson's statement to the police, a wristwatch with a blood stain, boots, and a set of keys." *Id.* at 86. Relying on this dissent, Johnson asked the trial court to suppress the tangible items listed in the dissenting opinion, along with a ball cap and shirt he had been wearing.

The trial court held a hearing on Johnson's motion. Johnson argued that the law-of-the-case doctrine prevented the trial court from hearing additional evidence on his motion to suppress. The trial court agreed that the jeans and the knife that had been seized from the hotel room had to be excluded; however, the court noted that it had to determine whether the watch, keys, boots, and clothes flowed from the search at the hotel. After hearing testimony from the officers who conducted the search and investigation of Johnson the night of the Cahoon murder, the court ruled that the watch and keys should be suppressed, but the boots and other items of clothing that Johnson had been wearing would be admitted.

Following the trial court's denial of his suppression motion, Johnson entered a conditional plea of guilty to second-degree murder pursuant to Ark. R. Crim. P. 24.3(b), and the trial court sentenced him to twenty years' imprisonment. Johnson has pursued an interlocutory appeal from the trial court's ruling; on appeal, he argues that the law-of-the-case doctrine should have precluded the trial court from holding a hearing on his motion to suppress, and that the trial court erred in denying his motion.

On appeal, Johnson first contends that the law-of-the-case doctrine barred the trial court from holding an evidentiary hearing on remand. He asserts that the trial court "was under instruction

from the supreme court to suppress *all* of the evidence obtained pursuant to the search." Because this court had previously determined the illegality of the search, he claims, the trial court was without jurisdiction to reconsider the suppression issue.

■ The doctrine of law of the case ordinarily arises in the case of a second appeal and requires that matters decided in the first appeal be considered concluded. *Cloird v. State*, 352 Ark. 190, 99 S.W.3d 419 (2003); *Camargo v. State*, 337 Ark. 105, 987 S.W.2d 680 (1999). Thus, the doctrine dictates that a decision made in a prior appeal may not be revisited in a subsequent appeal. *Green v. State*, 343 Ark. 244, 33 S.W.3d 485 (2000). However, matters that have not been decided, explicitly or implicitly, do not become law of the case merely because they could have been decided. *Camargo, supra*.

In his appeal, Johnson argues that, because this court held that the search of his home was illegal and that the trial court erred in not suppressing all the evidence, the lower court was without authority to hold a second evidentiary hearing and reconsider the arguments of the State regarding the suppression of evidence resulting from the illegal search. He asserts that this court unequivocally held that the police officers' actions were unconstitutional and ordered the trial court to suppress the evidence as a result; this was not an issue left open for the trial court to revisit.

*Foreman v. State*, 328 Ark. 583, 945 S.W.2d 926 (1997) (*Foreman II*), is instructive on this question. There, this court considered a law-of-the-case issue in conjunction with a motion to suppress. Foreman had been convicted of first-degree murder; on appeal, this court reversed his conviction and remanded the case, holding that the trial court had erred in admitting Foreman's statement to police because the State failed to produce a material witness at the *Denno* hearing held before the first trial, and thereby failed to sustain its burden of proof as to the voluntariness of the statement. *See Foreman v. State*, 321 Ark. 167, 901 S.W.2d 802 (1995) (*Foreman I*). This court reversed and remanded, and its mandate provided that the case was to be returned to the trial court "for further proceedings to be had therein according to law, and not inconsistent with the opinion herein delivered." *Foreman II*, 328 Ark. at 590.

Upon remand, the trial court held an additional *Denno* hearing prior to the second trial and permitted the State to present the testimony of the material witness who had not testified prior to

the first trial. Following that hearing, the trial court ruled that Foreman's statement was voluntary and admitted it into evidence. *Id.* On appeal in *Foreman II*, Foreman argued that the statement was admitted in the second trial in violation of the law-of-the-case doctrine. *Id.* at 591.

This court disagreed, rejecting Foreman's argument because it was "clear that we did not determine in *Foreman I* that his custodial statement was involuntary or inadmissible." *Id.* at 592. The court continued as follows:

> We made no pronouncement in *Foreman I* with respect to the voluntariness of the statement. Rather, we held only that the State failed to carry its burden of proving the statement was voluntarily given, and that the statement therefore should not have been admitted at trial. Our mandate permitted the trial court to conduct further proceedings consistent with our opinion in *Foreman I*, and the decision to hold a second *Denno* hearing was in accordance with our mandate.

*Id.*

█ Similarly, in the present case, our earlier opinion and mandate left open the question of what items flowed from the illegal search. The mandate in the instant case provided that Johnson's conviction was "reversed and remanded in part for the reasons set out in the attached opinion." In turn, as discussed above, the "attached opinion" remanded the case for suppression of "all evidence that flowed from [the] unconstitutional search." This court did not, contrary to Johnson's argument, hold that *every* item of evidence had to be suppressed, nor did the court specify *which* items were to be suppressed.[1] Rather, the clear implication of this court's remand was for the trial court to determine for itself which items of evidence flowed from the illegal search. Clearly, the trial court's decision to conduct a second hearing regarding the

---

[1] Johnson relies heavily on the dissenting opinion filed by Justice Thornton in *Woolbright*. However, this was not the majority opinion of the court. Further, Justice Thornton was not discussing the merits of this court's decision on the suppression issue in Johnson's case; rather, he was discussing the manner in which the introduction of this evidence prejudiced Johnson's co-defendant, Rebecca Woolbright. As such, it is of no moment that Justice Thornton listed certain specific items of evidence, and it certainly does not compel a conclusion that this listing of items was conclusive and exhaustive for purposes of retrial.

admissibility of the evidence seized from Johnson's hotel room was in accordance with our mandate. As such, Johnson's argument that the trial court had no jurisdiction to hold another suppression hearing is without merit.[2]

In his second point on appeal, Johnson argues that the trial court erroneously failed to suppress all evidence obtained as a result of the knock-and-talk search. Specifically, he maintains that the trial court erred in refusing to suppress his boots, clothing, and the testimony of State criminologists regarding the results of tests run on these items.

In an appeal from the denial of a motion to suppress, this court conducts a *de novo* review based on the totality of the circumstances, reviewing findings of historical facts for clear error and determining whether those facts give rise to reasonable suspicion or probable cause, giving due weight to inferences drawn by the trial court. *Davis v. State*, 351 Ark. 406, 94 S.W.3d 892 (2003).

At the outset of the suppression hearing, the trial court agreed that the items seized from Johnson's hotel room — the jeans and the pocket knife — would be excluded, as they clearly flowed from the illegal search. However, as to the other items of evidence enumerated in Johnson's motion to suppress — specifically, the watch, keys, and boots — the court noted that it would have to determine whether there had been some intervening event that broke the causal connection between the Fourth Amendment violation and the obtaining of the watch, boots, and keys.

The court heard testimony from Detective David Joplin of the Fort Smith Police Department. Joplin testified that he and other officers had received word that somebody named "Carl," who was staying at the Inn Towne Lodge, may have been involved in a murder. When the officers arrived at the motel, they went to

---

[2] In his reply brief, Johnson argues that this court held in *Dolphin v. Wilson*, 335 Ark. 113, 983 S.W.2d 113 (1998), that "[n]either new proof [n]or new defenses can[] be raised after remand when they are inconsistent with this court's first opinion and mandate." *Dolphin*, 335 Ark. at 120. However, the *Dolphin* case is inapposite. There, upon remand, the parties interjected an entirely new legal theory into the matter, and the trial court considered and decided the case on the basis of that new theory. On appeal, this court held that the trial court's actions were erroneous, because the lower court had disregarded this court's mandate to enter an order "consistent with our opinion" from the first trial. Here, however, the trial court's holding of an additional hearing to determine what evidence flowed from the search was entirely consistent with this court's opinion.

Johnson's room and asked if they could come in and speak to him. While inside the room, the officers discovered a pair of jeans with a stain on them; in addition, the officers retrieved a pocket knife from the pocket of the pants Johnson was wearing. The officers then asked Johnson if he would come down to the police station to talk with them. Johnson agreed, but because he did not have a car, he accepted the officers' offer to ride with them in an unmarked detective's car.

When they arrived at the police station, Joplin and Johnson sat in Joplin's cubicle on the second floor. At that time, Joplin testified, Johnson was not in custody, stating that the officers "really didn't know what we had, and we just asked him to come to the police station and talk to us to see if we could get it figured out." Joplin also stated that, at the time they were talking to Johnson, the officers were unaware that an actual murder had taken place. After arriving at the police station, Johnson was allowed to go outside and smoke a cigarette. When Johnson came back in, Detective Lannie Reese sat down to talk with him and noticed that Johnson's watch appeared to have dried blood on it. Reese asked Johnson for the watch, and Johnson handed it over.

Shortly thereafter, Woolbright came to the police station and told officers that she had witnessed Johnson kill Cahoon and that she knew where the body was. At that point, Joplin stated, Johnson was in custody. As Joplin and the other detectives left the police station to find the body, Patrol Officer Daniel Grubbs was called in to keep an eye on Johnson. Because Grubbs was going to be left alone with a murder suspect, he asked if the other officers could wait until he patted Johnson down in a search for any type of weapons. During the course of his pat-down search, Grubbs discovered a set of keys in Johnson's jacket pocket. The boots, according to Joplin's uncontradicted testimony, were seized at the time Johnson was arrested and booked at the jail; at the same time, police also seized Johnson's cap and other clothing he had on.

At the conclusion of the hearing, the trial court ruled it was "obvious" that the jeans and the knife that had been seized at the motel room would have to be suppressed. In addition, the court noted that the watch and keys had been seized at the police station before Woolbright came to the station and told the officers about the murder. Prior to that time, the court ruled, there had been no other independent information about the murder; as such, the court also suppressed the watch and the keys. However, after Woolbright made her statement and the officers found Cahoon's

body, Johnson was placed under arrest. The court therefore determined that the boots and clothing had not been seized until that time, and therefore, they would be admissible.

■ On appeal, Johnson argues that the trial court incorrectly determined that Woolbright's statement to the police that she had witnessed the murder constituted an intervening event sufficient to dissipate the taint of the illegal search.[3] We disagree. This court has held that, once it determines that an unlawful seizure has taken place, it must then consider whether contraband seized from the execution of that search should be suppressed. *See Keenom v. State*, 349 Ark. 381, 80 S.W.3d 743 (2002) (citing *Wong Sun v. United States*, 371 U.S. 471 (1963)). In *Keenom*, this court quoted *Wong Sun* as follows:

> We need not hold that all evidence is "fruit of the poisonous tree" simply because it would not have come to light but for the illegal actions of the police. Rather, the more apt question in such a case is "whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint."

*Keenom*, 349 Ark. at 390-91 (quoting *Wong Sun*) (internal citations omitted).

■ In *Stone v. State*, 348 Ark. 661, 74 S.W.3d 591 (2002), this court considered the question of whether and by what means, given an illegal entry by police, a defect in the search can be cured. The court there was confronted with a situation in which the suspect consented to a search by police, after he had spoken with his attorney. In analyzing the issue, the court had to determine whether Stone's consent to search was "sufficiently an act of free will to purge the primary taint." *Stone*, 348 Ark. at 673 (citing *United States v. Ramos*, 42 F.3d 1160 (8th Cir. 1994)). The court continued, observing the following:

> [T]he attenuation must be determined by weighing the seriousness of the police misconduct. *Brown v. Illinois*, 422 U.S. 590

---

[3] Johnson also reiterates his argument that the trial court was not authorized to consider "new" testimony at the suppression hearing; however, we have already rejected this argument, and will not consider or discuss it again here.

(1975). This court has . . . held that an intervening event can be an attenuating circumstance. *See, e.g., Brewer v. State*, 271 Ark. 810, 611 S.W.2d 179 (1981) (taint of pretextual arrest attenuated when defendant's girlfriend told defendant that she had already implicated him in the criminal activity).

*Stone*, 348 Ark. at 674.

Thus, the question is "whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." *See Wong Sun, supra.* In the present case, Johnson argues that the objectionable evidence consists of his boots and clothing, and the testimony of a criminologist regarding evidence gleaned from the boots. We must determine whether this evidence was gotten by exploitation of the illegal search at the hotel room, or whether there was some intervening event that purged that taint. Here, the trial court concluded that the appearance of Rebecca Woolbright at the police station, and her statement that she had witnessed Johnson kill Cahoon and that she knew where the body was, was a sufficient intervening event.

The *Brewer* case, cited above in *Stone*, is instructive on this point. There, appellant Brewer was arrested on a charge of burglary and was later charged with murder. Brewer argued that his arrest on burglary charges was merely a pretext, and the statement he gave following that arrest implicating himself in the murder was the product of the illegal arrest. This court first held that the arrest was not pretextual or illegal. *Brewer*, 271 Ark. at 813. However, even assuming that it had been illegal, the court held that there was a sufficient intervening circumstance that attenuated any taint from the arrest: Brewer's first statement to police was not incriminating, but after he gave that statement, his girlfriend told him that she had already spoken to the police and told them that he had been involved in the murder. Shortly thereafter, Brewer gave an incriminating statement. This court held that the intervening act of the girlfriend's comments, and Brewer's subsequent decision to confess, removed the taint of the allegedly illegal arrest. *Id.* at 814.

Here, likewise, Woolbright's telling the police that Johnson killed Cahoon was a sufficient intervening event. At this point, Johnson was in custody for his participation in the murder, and the officers' conduct following that point, including the

seizure of his boots and clothing, was premised on his being under arrest, not on the illegal search at the hotel room. The uncontradicted evidence before the trial court at the suppression hearing was that Johnson's boots and clothing were not seized until after this intervening event. As such, the trial court did not err in deeming the boots and clothing admissible.

Affirmed.